1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHYSICIANS COMMITTEE FOR
RESPONSIBLE MEDICINE, et al.,

Plaintiffs,

v.

TOM VILSACK, et al.,

Defendants.

Case No. 21-cv-03088-RS

**ORDER GRANTING MOTION TO
DISMISS**

## I. INTRODUCTION

In this action, Plaintiffs Physicians Committee for Responsible Medicine and three individual physicians challenge the Dietary Guidelines for Americans under the Administrative Procedure Act, claiming the Guidelines contain misinformation and harm both the organization and its members. Defendants United States Department of Agriculture and Department of Health and Human Services move to dismiss. For the reasons set forth below, the motion to dismiss is granted for both lack of standing and failure to state a claim.

## II. BACKGROUND[1]

Beginning in 1980 and every five years thereafter, the United States Department of Agriculture and the Department of Health and Human Services have jointly published a report entitled the Dietary Guidelines for Americans ("Guidelines"), which provides advice and

---

[1] The factual background is based on the well-pled allegations in the complaint, which are taken as true for the purposes of this motion.

recommendations on nutrition and healthy eating. As mandated by law, the Guidelines "shall contain nutritional and dietary information and guidelines for the general public" that is "based on the preponderance of the scientific and medical knowledge which is current at the time the report is prepared," and "shall be promoted by each Federal agency in carrying out any Federal food, nutrition, or health program." 7 U.S.C. § 5341(a)(1)-(2). These Guidelines are then used as the basis of the government's "food assistance and meal programs, nutrition education efforts, and decisions about national[2] health objectives." Guidelines at 12. In some instances, adherence to the Guidelines is a condition of receiving grant funds for specific programs. The latest version of these Guidelines, the 2020-2025 edition, was published in December 2020.

Established in 1985, the Physicians Committee for Responsible Medicine ("PCRM") is a "nonprofit public health organization that advocates for preventive medicine through proper nutrition, encourages higher standards for ethics and effectiveness in medical research, and conducts clinical research on the relationships between food and disease," Dkt. 24 at 3. PCRM claims to represent more than 175,000 members, including 17,000 physicians, and, along with three individual physicians (Seth Ammerman, Donald Forrester, and Heather Shenkman) (together, "Plaintiffs"), brings suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging the Guidelines. In particular, Plaintiffs object to the Guidelines' inclusion of dairy products and meat, and the failure adequately to highlight the risks of both, which Plaintiffs claim does not reflect the preponderance of current scientific and medical knowledge, and thereby constitutes arbitrary and capricious agency action.

Plaintiffs request a declaratory judgment that the Guidelines violate the APA by failing to reflect the preponderance of current scientific and medical knowledge; and an order to Defendants to: (1) withdraw portions of the Guidelines that hide the ill effects of consuming meat and dairy; (2) withdraw portions of the Guidelines that do not include beans, peas, and lentils as acceptable protein sources; and (3) remove the statement that healthy diets must feature dairy products.

---

[2] The Guidelines have also been incorporated into various state regulations.

### III. LEGAL STANDARDS

Article III of the U.S. Constitution authorizes the judiciary to adjudicate only "cases" and "controversies." The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Defendants move to dismiss on the basis that Plaintiffs lack standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure. A 12(b)(1) motion to dismiss a complaint challenges the court's subject matter jurisdiction over the asserted claims. It is the plaintiff's burden to prove jurisdiction at the time the action is commenced. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Id.* Accordingly, when considering this type of challenge, the court is required to "accept as true the allegations of the complaint." *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001). However, "the district court is not restricted to the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

Defendants also allege that Plaintiffs fail to state a claim. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the claims alleged in the

1    complaint. Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal

2    theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *See*

3    *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (internal quotation marks and

4    citation omitted). When evaluating such a motion, the court must accept all material allegations in

5    the complaint as true and construe them in the light most favorable to the non-moving party. *In re*

6    *Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). It must also "draw all

7    reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d

8    556, 561 (9th Cir. 1987).

### IV. DISCUSSION

### A.  Plaintiffs Lack Standing to Bring Suit

Standing represents a threshold issue arising before any consideration of other substantive

grounds for dismissal. Accordingly, it is necessary to turn first to that aspect of the motion.

#### 1.  *PCRM's Standing on Its Own Behalf (PCRM)*

The standard for organizational first-party standing traces back to the Supreme Court

decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Under that framework, PCRM

can demonstrate the requisite injury for standing on its own behalf if it shows that it has suffered

"*both* a diversion of its resources and a frustration of its mission." *Fair Hous. of Marin v. Combs*,

285 F.3d 899, 905 (9th Cir. 2002) (emphasis added).

A diversion of resources exists where organizations have "expended additional resources

that they would not otherwise have expended, and in ways that they would not have expended

them." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021) (quoting

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)). By contrast, courts

decline to find a diversion of resources where an organization "merely continu[es] ongoing

activities"—that is, where the activities allegedly undertaken to combat the complained-of conduct

constitute "business as usual" and a "continuation of existing advocacy." *Id.* at 943.

PCRM claims that the Guidelines harm the organization by compelling it to expend scarce

resources to counter misinformation regarding healthy diets. The Complaint elaborates on this in a

United States District Court
Northern District of California

single sentence, noting only that PCRM is forced to "expend substantial time and resources that normally would be devoted to other organizational initiatives, such as the Humane Charity Seal of Approval program, to inform the public that the Dietary Guidelines reflect the economic interests of the meat and dairy industries rather than sound public health advice." Dkt. 24 at 5. Although "case law is admittedly nebulous as to what qualifies as a requisite diversion of resources for organizational standing under Article III," *One Fair Wage, Inc. v. Darden Restaurants Inc.*, 2021 WL 4170788, at *14 (N.D. Cal. Sept. 14, 2021), and it is possible for a diversion-of-resources injury to be "broadly alleged," *Sabra v. Maricopa Cnty. Cmnty. College Dist.*, 44 F.4th 867, 880 (9th Cir. 2022), Plaintiffs have not described, in even rudimentary fashion, what form the diversion took in this instance. *Compare id.* (noting the organization developed a public-awareness campaign and diverted resources by "contracting with a religious scholar who assisted in creating materials for the campaign").[3] Without more, Plaintiffs' conclusory statement that they were forced to expend resources countering the Guidelines is not sufficient—nor does it enable a determination of whether those actions, whatever they might be, are distinguishable from "business as usual."[4] Accordingly, Plaintiffs fail adequately to plead a change showing a diversion of resources.

   Plaintiffs face a similar hurdle with respect to the second frustration of mission prong.

---

[3] Plaintiffs allege their diversion of resources injury is similar to that alleged by the Organic Consumer Association in *Organic Consumers Ass'n v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005 (N.D. Cal. 2018). Even there, however, OCA provided allegations in its complaint that it "conducted research into [Defendant's] farming practices and advertising, prepared internal memoranda, conducted strategy meetings, and developed and coordinated a multi-organization consumer outreach plan including call-to-action emails and online alerts. OCA has also responded to concerns from consumers and its members related to Sanderson's misrepresentations." *Id.* at 1011.

[4] Plaintiffs note in their Opposition brief that PCRM's participation on the Advisory Committee for the Guidelines constitutes additional evidence of resources expended, but this does not seem distinct from the "advocacy for preventive medicine through proper nutrition" that Plaintiffs claim is central to their organization. This is especially true in light of Defendants' account of PCRM's long history of advocacy in this space, which includes decades of opposition to the Guidelines. *See* Dkt. 26 at 11 (noting that PCRM has been promoting alternatives to the Guidelines since 1991, and that PCRM indicated on its website that it has "worked to ensure" the Guidelines contain plant-based diets and that the development process reveals any conflict of interest since 1995).

United States District Court
Northern District of California

1   "[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to

2   establish Article III standing"—indeed, the D.C. Circuit has explained:

3       [I]n those cases where an organization alleges that a defendant's conduct has made
        the organization's *activities* more difficult, the presence of a direct conflict between
4       the defendant's conduct and the organization's *mission* is necessary—though not
        alone sufficient—to establish standing. If a defendant's conduct does not conflict
5       directly with an organization's stated goals, it is entirely speculative whether the
        defendant's conduct is impeding the organization's activities. Moreover, in those
6       cases where governmental action is challenged, if the government's conduct does
        not directly conflict with the organization's mission, the alleged injury to the
7       organization likely will be one that is shared by a large class of citizens and thus
        insufficient to establish injury in fact.
8

9   *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

10      In addition to its advocacy "for preventive medicine through proper nutrition," Dkt. 24 at

11  3, PCRM's "organizational objective" is to "save and improve human and animal lives through

12  plant-based diets," which it claims is discouraged by the alleged misinformation contained in the

13  Guidelines and prevented by the incorporation of the Guidelines in programs like the National

14  School Lunch Program. Dkt. 27 at 4. This is enough, Plaintiffs argue, because standing requires

15  only a showing that the "action taken by the defendants [i]s at loggerheads with and squarely

16  countered the plaintiffs' organizational objective." *Id.* (quoting *Nat'l Treasury*, 101 F.3d at 1426-

17  30).

18      First, the Guidelines are not "at loggerheads" with PCRM's mission in the same manner as

19  in other cases upholding standing. In *Havens*, 455 U.S. at 379, *Fair Emp. Council of Greater*

20  *Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), *Hous. Opportunities*

21  *Made Equal, Inc. v. Cincinnati Enquirer*, 943 F.2d 644, 646 (6th Cir. 1991), and *Spann v.*

22  *Colonial Vill., Inc.*, 899 F.2d 24, 27-28 (D.C. Cir. 1990), the organizations claiming standing

23  "shared a central purpose of eliminating discriminatory [] practices," *Nat'l Treasury Emps. Union*

24  *v. United States*, 929 F. Supp. 484, 488 (D.D.C. 1996), and were challenging practices that

25  actively discriminated. In *Havens*, for example, a fair housing organization sued Havens Realty,

26  an apartment complex owner, alleging that the realty engaged in racial steering, a practice which

27  required the devotion of significant resources by the organization to identify and counteract. 455

28

U.S. 363.

Here, by contrast, publication of the Guidelines does not squarely counter PCRM's mission of saving and improving lives through plant-based diets in the same manner. The Guidelines purport to be "a customizable framework of core elements within which individuals make tailored and affordable choices," not a "rigid prescription" for diet, Guidelines at viii. As Defendants point out, they also make mention of options for which PCRM advocates, likely due to the participation of one of PCRM's members on the 2020 Dietary Guidelines Advisory Committee. Perhaps such references to plant-based or lactose-free options are not as prominent or obvious as PCRM would prefer, but the organization's recourse of additional advocacy still remains. As Defendants note, the Guidelines "in no way prohibit or otherwise limit PCRM's advocacy efforts," Dkt. 26 at 9—and PCRM should be able to continue those efforts, both within and without. Ultimately, even if the Guidelines as a whole are to be taken as advising the inclusion of meat and dairy in diets, that *recommendation* in and of itself does not squarely frustrate PCRM's mission in the way precedent has required for standing to be demonstrated.

### 2. PCRM's Standing on Behalf of Its Layperson Members

For an organization to assert associational standing and bring suit on behalf of one or more of its members, PCRM must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants contest only the first issue—whether PCRM's members have standing to sue in their own right. As a result, the inquiry centers on the three elements that make up the "irreducible constitutional minimum" of Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)—that is, whether: "(1) [PRCM's members have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). As the party invoking federal jurisdiction, PCRM bears the burden of establishing all three of these elements.

PCRM claims its layperson members are harmed because: (1) they are "misled as to the harmful effects of consuming meat and dairy," which "has a direct negative bearing on their health and their families' health"; and (2) they are impeded from raising their children on plant-based diets because: (i) schools adhere to the Guidelines through the National School Lunch Program, thereby causing financial injury, and (ii) physicians "lack guidance confirming that children receive adequate protein on a plant-based diet," thereby causing emotional injury. Dkt. 24 at 3. The injuries are exacerbated for people of color, according to the complaint, due to the disproportionate toll that dairy takes on those groups.

Plaintiffs identify certain areas where the text of the Dietary Guidelines is misleading. For example, rather than indicating simply that "dairy, meat, poultry, and eggs are high in saturated fat whether they are included in sandwiches or eaten on their own," the Guidelines say that "[t]he top sources of saturated fat for adults are sandwiches (e.g., deli sandwiches, burgers, tacos, burritos, grilled cheese, hot dogs) and other grain-based mixed dishes (e.g., spaghetti and meatballs, casseroles, quesadillas) that typically contain ingredients from several food groups that are not in nutrient-dense forms, including grains, protein foods, and dairy," and show an image "primarily featur[ing] avocados, nuts, and seeds" at the beginning of the "Saturated Fat" subsection, rather than an image showcasing dairy and meat. Dkt. 24 at 11-12 (quoting the Guidelines at 44, 102). As another example, Plaintiffs claim that the Guidelines incorrectly state that "'[m]ost individuals would benefit by increasing intake of dairy,' even though there is no convincing evidence that this is true." Dkt. 24 at 13 (quoting the Guidelines at 33). Further, Plaintiffs note that lactose intolerance is high among people of color, and yet the Guidelines only address this once with the statement that "[i]ndividuals who are lactose intolerant can choose low-lactose and lactose-free dairy products." *Id.* at 14-15 (quoting the Guidelines at 33).

a. Injury In Fact

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

"'[A]n injury in fact' is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Lujan*, 504 U.S. at 560) (alternation in original). Here, Plaintiffs fail to present harms that are not speculative. With respect to the Guidelines' allegedly misleading effect on laypersons, for instance, Plaintiffs do not show the "negative bearing" that these Guidelines have, much less that such impact is "direct." Indeed, even setting aside a lack of reference to specific layperson members who have been harmed, Plaintiffs do not even attempt to proffer sufficient allegations or factual descriptions in the complaint to show what kind of harm is being perpetrated. A "negative bearing" simply does not convey a concrete and particularized harm, and an injury in fact cannot be supposed from a generalized grievance that the Guidelines are allegedly misleading.

b.   Causation

Causation, the second element, requires a "causal connection between the injury and the conduct complained of." *Novak*, 795 F.3d at 1018 (9th Cir. 2015) (citing *Lujan*, 504 U.S. at 560). This element is concerned with ensuring that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (alternations in original). Even if concrete and particularized harm to layperson members is assumed, Plaintiffs' allegations that such harm is caused by the Guidelines, in light of the many factors that influence or affect a person's health, involve several layers of speculation. Plaintiffs can only conjecture that laypersons have deliberately chosen to eschew plant-based diets or consume more meat and dairy because of the latest Guidelines—rather than personal taste, financial circumstances, or any other potential factor; and that such dietary choices were the cause of their negative health outcomes—rather than any genetics, lifestyle choices, or consumption habits.[5]

---

[5] Notably, if Plaintiffs' argument is that laypersons were harmed as a result of their adherence to the Guidelines, Plaintiffs would also need to show that the laypersons otherwise followed the

With respect to laypersons' inability to raise children on plant-based diets because of the physicians who disapprove of them or the unavailability of such foods in the National School Lunch Program (NSLP), Defendants correctly point out that these are injuries stemming from third-party conduct, be it of the physicians,[6] or the authorities that codify and translate the Guidelines into specific program requirements,[7] or the schools who choose to participate in the relevant food programs and refrain from offering plant-based foods. Even granting that, as Plaintiffs claim, "statutory provisions . . . mandate that food served in schools and child care facilities . . . must reflect, and be consistent with, the goals of the most recent Dietary Guidelines," Dkt. 27 at 9, Plaintiffs fail to plead sufficient facts to show that this consistency standard is so rigid as to preclude plant-based diets. This is actually underscored by the options and alternatives permitted under the Guidelines, which are a framework, and relevant USDA regulations. *See, e.g.*, Dkt. 28 at 7 (describing that the "USDA expressly permits schools to offer 'meat alternatives' as part of the lunch meal pattern" under 7 C.F.R. § 210.10(c)(2)(i)). With these considerations in mind, Plaintiffs' complained-of injury cannot be said to be fairly traceable to the Guidelines.

### c.   Redressability

Because "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury," *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021), Plaintiffs must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561. Defendants also challenge this element, claiming that Plaintiffs offer "no plausible theory as to how enjoining the Dietary Guidelines," or portions thereof, "will appreciably change its layperson members' eating habits

---

Guidelines' recommendations with respect to its other prescriptions, such as portion sizes and reduction of saturated fats, among others.

[6] To the extent that laypersons whose "parental decision-making has been assailed by physicians who disapprove of raising children on plant-based diets" experience emotional distress, Dkt. 24 at 3, that harm is fairly traceable to the physicians themselves.

[7] As Defendants explain, the NSLP is "a separate agency action in which the UDSA exercises its administrative discretion, through rulemaking, to implement requirements for lunches served by schools participating in the program." Dkt. 28 at 6-7.

United States District Court
Northern District of California

and subsequently reverse any health problems already caused by those eating habits" or cause schools to provide vegan meals to schoolchildren. Dkt. 26 at 15-16.

In response, Plaintiffs cite *Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) and *Fam. & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052 (7th Cir. 1994) to emphasize that a favorable decision need not "inevitably" redress the injury, but need only provide a "probabilistic benefit from winning a suit." *Mishawaka*, 13 F.3d at 1058. Because the cases are factually distinguishable, however, neither offers much support—other than the language quoted for the legal standard—for Plaintiff's position.[8] *Beno* concerned a challenge to HHS' waiver from the federal requirements of the American Families with Dependent Children program, given to California to enable it to execute an experimental project. 30 F.3d at 1060–62. The plaintiffs, California residents whose AFDC aid was cut by the program, challenged the HHS Secretary's waiver as arbitrary and capricious. *Id.* In *Beno*, the state statutes made the experimental program contingent on HHS approval, so it was directly *because of* the waiver that the experimental program could issue; in that context, a decision setting the waiver aside would be likely to redress the plaintiffs' injuries.[9] Likewise in *Mishawaka*, the plaintiffs challenged the defendant's refusal to provide the plaintiffs with classrooms and related facilities for educating children with disabilities, which the plaintiffs argued the defendant was obligated to do under the Individuals with Disabilities Education Act (IDEA). A finding that the defendant was obligated to provide either rent payments or educational facilities would, therefore, directly redress the plaintiffs' claimed injury of deprivation of money to which they were otherwise entitled under the IDEA.

---

[8] Notably, the defendant in *Mishawaka* did not even challenge the plaintiffs' Article III standing; standing was summarily dispatched with little analysis specifically focused on redressability.

[9] The *Beno* court found that a ruling in favor of the plaintiffs would likely redress the injury, even though such a ruling could only remand the issue back to the Secretary for a further determination (and risk the issuance of another waiver) because: (1) the state statutes made the experimental program contingent on HHS approval, so the decision might make California's benefits cut illegal under state law and prevent the implementation of further benefit cuts; (2) the state decision-making agencies were parties to the suit and therefore bound by the court's legal conclusions; and (3) if found to be in violation, California stood to lose more than $14 billion in funding. *Id.* at 1065.

*Mishawaka*, 13 F.3d at 1059.

Here, by contrast, the likelihood that a favorable ruling would redress Plaintiffs' injuries is much lower. Even accepting Plaintiffs' allegations regarding the potential adverse effects of meat and dairy and acknowledging that the Guidelines could more clearly highlight them, a ruling to that effect is not likely to address the harms of "negative bearing" on the laypersons' health or inability to raise children on plant-based diets. In light of the many factors and choices that influence a person's health, Plaintiffs' proposed theory of redressability requires a series of inferences that render it more "speculative" than "likely." Plaintiffs' argument about plant-based diets is a somewhat closer call. Plaintiffs argue that the Guidelines have "been incorporated in a web of interconnected laws with binding effect on regulated parties," Dkt. 27 at 15, and they therefore "automatically trigger statutory and regulatory requirements." Dkt. 27 at 22.[10] Even here, however, the many layers of discretion and decision-making between the Guidelines and the ultimate injuries alleged attenuate the potential effects of a favorable ruling. For example, statutory requirements that "food served in schools and child care facilities . . . must *reflect*, and *be consistent with*, the goals of the most recent Dietary Guidelines," Dkt. 27 at 9 (emphasis added), evince discretion and flexibility that do not necessarily make vegan meals in facilities more likely, even if it is assumed that vegan meals would be likely to bolster health. Indeed, the Ninth Circuit has recognized that the "'likely' standard is altered somewhat when third parties not before the court must change their behavior in order for any injury suffered to be redressed." *Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009):

> When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of

---

[10] Although these arguments were offered in service of Plaintiffs' point regarding agency action, they have some bearing on the redressability analysis and are therefore also discussed here.

broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Id.* (citing *Lujan*, 504 U.S. at 561–62). Plaintiffs have therefore also failed to show this element.

### 3.   Standing of the Three Physicians & PCRM's Standing on Behalf of Its Physician Members

PCRM claims its physician members are harmed because the Guidelines interfere with patient education and undermine patient care—and that such harm is "particularly true" for members working in facilities required to serve meals based off the Guidelines. The Guidelines constrain their ability to prescribe meal plans or provide nutrition advice, leading to patients' negative health outcomes due to a lack of access to plant-based meals, and resulting in emotional injury, due to the physicians' close relationships with their patients and interest in their patients' wellbeing.

Along those lines, the three physician plaintiffs, Seth Ammerman, Donald Forrester, and Heather Shenkman, variously claim that the Guidelines: (1) impair the health of their patients and make their professional objective of keeping their patients healthy more difficult; (2) cause them emotional injury because of their patients' negative health consequences arising from a failure to adopt plant-based diets; (3) create a dilemma of having to make medical recommendations that are contrary to the Guidelines; (4) present "theoretical exposure to liability based on any alleged 'reasonableness' standard derived from the Guidelines"; and (5) lead to greater job stress and lost time and money because of the Guidelines' incorporation in various expert recommendations and clinician performance evaluations. Dkt. 24 at 5-7.

For the same reasons that contribute to PCRM's lack of standing for its layperson members, Plaintiffs fail to show standing for the injuries predicated on the theory that the Dietary Guidelines affect patients' health. The alleged harm to the physicians from their patients' negative health outcomes is, in fact, even more attenuated. As for the dilemma of making recommendations contrary to the Guidelines, and any potential liability stemming therefrom, Plaintiffs provide

United States District Court
Northern District of California

1    scarce little detail regarding the "dilemma," including why it exists or would constitute harm,

2    considering Plaintiffs' position that the Guidelines are scientifically unsound. Further, Plaintiffs'

3    own acknowledgement that exposure to liability is only "theoretical" illustrates the entirely

4    speculative nature of the injury, which is "far-fetched," in light of the flexibility of the Guidelines.

5    Dkt. 26 at 19.  Finally, while economic detriment and loss of opportunity can be legally

6    cognizable harms, *see Abboud v. I.N.S.*, 140 F.3d 843, 847 (9th Cir. 1998) (finding that a lost

7    opportunity represents a concrete injury), Plaintiffs' generalized and cursory descriptions of these

8    harms do not sufficiently set out a concrete injury, just as the dearth of facts make it difficult to

9    analyze whether such an injury, even if concrete and particularized, is redressable. *See, e.g.*, Dkt.

10   24 at 6 ("Dr. Forrester is harmed by the Dietary Guidelines because . . . [his] work is made more

11   difficult when the Dietary Guidelines contradict sound scientific information . . . . Dr. Forester has

12   lost time and money because . . . bonuses [are] based on the standards set by the Dietary

13   Guidelines and their implementation.").

14        On the basis of the averments currently alleged in the Complaint, the physicians fail to

15   satisfy their burden of showing standing. In the same vein, PCRM also fails to show associational

16   standing on behalf of their physician members, as such standing can only be asserted if PCRM's

17   physician members would have standing themselves. As a result, Plaintiffs' claims must be

18   dismissed. While Plaintiffs theoretically might be able to supply additional facts that would

19   support a finding of standing, because the Guidelines do not amount to final agency action, as set

20   forth below, any amendment would be futile and therefore dismissal is without leave to amend.

21        **B.  The Dietary Guidelines Are Not Final Agency Action**

22        The APA authorizes judicial review of "final agency action for which there is no other

23   adequate remedy." *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (citing 5 U.S.C. § 704). Defendants

24   argue that the Guidelines are not properly subject to challenge under the APA, as they do not

25   constitute agency action, much less *final* agency action.

26             *1.  Agency Action*

27        Defendants argue that, as a threshold matter, collateral estoppel precludes the suit, because

a district court has already held that the Dietary Guidelines are not agency action reviewable under the APA. As that district court explained:

> The Dietary Guidelines . . . is not an agency statement describing the USDA or DHHS organizations or the agencies' procedures or practice requirements. It is, in sum, a report containing "nutritional and dietary information and guidelines for the general public." 7 U.S.C. § 5341(a)(1). As the Nutrition Act makes clear, such dietary guidance "does not include any rule or regulation issued by a Federal agency," and thus, does not constitute an "agency action." *Id.* § 5341(b)(3). Therefore, because plaintiff has not established that the Dietary Guidelines is actually subject to judicial review under the APA, it has failed to state a claim upon which relief can be granted.

*Physicians Comm. for Responsible Med. v. Vilsack*, 867 F. Supp. 2d 24, 30 (D.D.C. 2011) ("PCRM 2011").

Collateral estoppel, or issue preclusion, is a doctrine preventing the relitigation of issues actually adjudicated in previous litigation between the same parties. *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) (citing 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4402 (1981)). A related doctrine, res judicata, or claim preclusion, prevents relitigation of claims that were previously tried and decided. *Id.* Both doctrines were designed with the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, (1979).

In order for collateral estoppel to apply, four elements must be established: "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008). It is the burden of the party seeking to rely upon issue preclusion to prove that each element has been met. *Id.* at 1050–51.

Plaintiffs argue issue preclusion should not be applied because the present action is based on a distinct legal theory—that is, its argument that the Guidelines are agency action targets a

1    different portion of the definition of "rule" under 5 U.S.C. § 551(4).[11] In PCRM 2011, Plaintiffs

2    argued that the Dietary Guidelines constituted a rule because they "describ[e] the organization,

3    procedure, or practice requirements of an agency," whereas here they argue the Guidelines are

4    "designed to implement, interpret, or prescribe law or policy." Dkt. 27 at 12-13, 18-19.

5            Plaintiffs' position that different arguments were advanced and considered is ultimately not

6    persuasive, because "once an issue is raised and determined, it is the entire issue that is precluded,

7    not just the particular arguments raised in support of it in the first case." *Kamilche Co. v. United*

8    *States*, 53 F.3d 1059, 1063 (9th Cir. 1995) (citing *Yamaha Corp. of America v. United States*, 961

9    F.2d 245, 254 (D.C. Cir. 1992)); *see also* Restatement (Second) of Judgments § 27 ("[I]f the party

10   against whom preclusion is sought did in fact litigate an issue [of law] . . . and suffered an adverse

11   determination, . . . new arguments may not be presented to obtain a different determination of that

12   issue."); *accord Smith v. Harrington*, 2015 WL 1407292, at *16 (N.D. Cal. Mar. 27, 2015)

13   ("Clearly a former judgment is not a collateral estoppel on issues which might have been raised

14   but were not; just as clearly it is a collateral estoppel on issues which were raised, even though

15   some factual matters or legal arguments which could have been presented were not."). The

16   threshold issue for Plaintiffs' prior challenge to the Guidelines in PRCM 2011 was whether the

17   Guidelines constituted agency action reviewable under the APA as a "rule"—as defined in

18   5 U.S.C. § 551(4); Plaintiffs' attempt to recast the issue more narrowly falls short. Indeed, to hold

19   otherwise—and confine the issue to the specific arguments and legal theories that Plaintiffs

20   strategically decided to advance—runs the risk of incentivizing litigant gamesmanship and runs

21   contrary to the spirit of the doctrine.[12]

22

23   [11] That provision reads: "(4) 'rule' means the whole or a part of an agency statement of general or
     particular applicability and future effect designed to implement, interpret, or prescribe law or
24   policy or describing the organization, procedure, or practice requirements of an agency and
     includes the approval or prescription for the future of rates, wages, corporate or financial
25   structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor
     or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C.
26   § 551(4).

27   [12] Because the *Kamilche* analysis cited above is dispositive with respect to the applicability of
     preclusion in the face of different arguments for the same issue, the Ninth Circuit's factors for

28                                                          ORDER GRANTING MOTION TO DISMISS
                                                            CASE NO. 21-cv-03088-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs further argue, appealing to *Montana v. United States*, 440 U.S. 147 (1979), that a changed legal landscape—due to the "web of interconnected statutory and regulatory enactments that have incorporated the . . . Guidelines into binding requirements since the previous litigation," Dkt. 27 at 19, and the decision in *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016)—would make collateral estoppel inappropriate. *See Montana*, 440 U.S. at 155 ("[D]etermin[ing] the appropriate application of collateral estoppel" requires an inquiry of "whether controlling facts or legal principles have changed significantly since the . . . judgment."). These arguments, however, fare no better. Plaintiffs point to certain nutrition programs and explain that even if many of their statutes predated the PCRM 2011 decision, certain implementing regulations were enacted after the decision, such as 81 Fed. Reg. 24,347 (Apr. 25, 2016) and 77 Fed. Reg. 4088 (Jan. 26, 2012). Yet nowhere do Plaintiffs explain what significant changes the implementing regulations have wrought; this is particularly problematic in light of the fact that several statutes predating the PCRM 2011 decision also contained directives to "be consistent with the most recent Dietary Guidelines." Pub. L. No. 111-296, § 202, 124 Stat. 3183, 3216 (Dec. 13, 2010); *see also id.* § 208, 124 Stat. 3183, 3221 ("In establishing nutrition standards under this paragraph, the Secretary shall establish standards that are consistent with the most recent Dietary Guidelines . . . .").

Plaintiffs' explanation of the relevance of *Hawkes* in rendering issue preclusion inapplicable is also unavailing. Plaintiffs fail to explain how the *Hawkes*' holding—that "legal consequences may flow from an agency action even if 'no administrative or criminal proceeding can be brought for failure to conform,'" Dkt. 27 at 19-20 (citing *Hawkes*, 578 U.S. at 600)—

---

determining whether issues are identical is not analyzed here. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017) ("(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?; (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?; (3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?; (4) how closely related are the claims involved in the two proceedings?") (quoting *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995)).

makes issue preclusion inapplicable. The PCRM 2011 decision did not hinge on arguments claiming the Guidelines were not agency action because no administrative or criminal proceeding could be brought. As Defendants point out, the PCRM 2011 court made its determination on the basis of the language of the APA and the statute authorizing the Guidelines. *See* PCRM 2011, 867 F. Supp. 2d at 30. ("As the Nutrition Act makes clear, such dietary guidance 'does not include any rule or regulation issued by a Federal agency,' and thus, does not constitute an 'agency action.'") (quoting 7 U.S.C. § 5341(b)(3).)

Because the issue is identical here as in PCRM 2011, and PCRM received an adverse decision on the issue despite a full and fair opportunity to litigate it directly, collateral estoppel applies to all Plaintiffs.[13]

### 2. *Final Agency Action*

Even were collateral estoppel not applicable, however, Plaintiffs' complaint fails to show that the Guidelines would constitute final agency action reviewable under the APA.[14] For agency action to be final, two conditions must be met: "[f]irst, the action must mark the 'consummation' of the agency's decisionmaking process"; and "second, the action must be one by which 'rights or

---

[13] Plaintiffs also argue that preclusive effect should not extend to the individual plaintiffs because they are not in privity with PCRM in the prior action. That does not ring true. "Even when the parties are not identical, privity may exist if there is substantial identity between parties, that is, when there is sufficient commonality of interest." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (internal quotation marks and citations omitted). Indeed, the Ninth Circuit has described privity as "a flexible concept dependent on the particular relationship between the parties in each individual set of cases," *id.* at 1081-82, and expressed that "federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997). Even if the three physicians assert a different legal theory here than was raised in PRCM 2011, the specific issue—whether the Guidelines are agency action reviewable under the APA—is a threshold issue identical in nature and common to both cases (and also properly analyzed before the merits of the parties' substantive arguments regarding the Guidelines). There is no reason that the individual physician plaintiffs' interests would not have been adequately represented by PCRM, which had ample physician members, in the earlier suit, nor any apparent difference in the specific issue that would naturally flow from Plaintiffs' differing allegations. Plaintiffs have therefore not provided adequate explanation counseling against the application of collateral estoppel here.

[14] Plaintiffs' other arguments that the Guidelines constitute agency action are all predicated on the theory that "they trigger obligations under other laws," Dkt. 27 at 12-18, which relate to the legal consequences analysis of *final* agency action. Therefore, those arguments are addressed here.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 21-cv-03088-RS

1    obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett,* 520

2    U.S. at 177-78. Only the second of these conditions is challenged.

3         In support of the position that the Guidelines do determine rights or obligations, or give

4    rise to legal consequences, Plaintiffs argue that the Guidelines "'prescribe law or policy' through

5    specific legal requirements [that are] automatically 'triggered' by the publication of the

6    Guidelines." Dkt. 27 at 13. In other words, although the Guidelines themselves do not impose

7    legal obligations, their implementation in various state and federal statutes give them the practical

8    effect of doing so. In so arguing, Plaintiffs rely heavily on two cases: *Tozzi v. U.S. Dep't of Health

9    & Hum. Servs.*, 271 F.3d 301 (D.C. Cir. 2001), wherein the D.C. Circuit found reviewable HHS'

10   decision to upgrade a substance from "reasonably anticipated" to be a carcinogen to "known"

11   carcinogen in its biennial "Report on Carcinogens." *Id.* at 303, 310-11; and *Synthetic Organic

12   Chem. Mfrs. Ass'n v. Sec'y, Dep't of Health & Hum. Servs.*, 720 F. Supp. 1244 (W.D. La. 1989),

13   also concerning HHS' procedures and criteria under which chemical substances are classified as

14   carcinogens in its Reports. As *Tozzi* explained, "listing a substance as a human carcinogen triggers

15   obligations," *Tozzi,* 271 F.3d at 310, such as: (1) requiring manufacturers to label the substance as

16   a carcinogen and adopt special procedures for every substance listed in the Report; and (2)

17   requiring Department of Labor-regulated mine operators to identify hazardous chemicals produced

18   or brought on to mine property. *Id.* at 304.

19        As Defendants note, the cases concerning the Report on Carcinogens are distinguishable. It

20   is indisputable that the cases Plaintiffs reference hold that reports, even ones that purport to be

21   only informational, can assume the status of final agency action if they are incorporated in

22   regulations such that they have a binding, legal effect. The obligations discussed in *Tozzi,*

23   however, prescribe concrete and specific obligations that automatically flow from the publication

24   of the carcinogen report. By contrast, although the Dietary Guidelines might broadly shape the

25   contours of offerings in nutritional programs, their inherent flexibility[15] necessarily precludes

26

27   ───────────────
     [15] The Guidelines "also explicitly emphasize that a healthy dietary pattern is not a rigid
     prescription. Rather, the Guidelines are a customizable framework of core elements within which

28
                                          ORDER GRANTING MOTION TO DISMISS
                                          CASE NO. 21-cv-03088-RS

United States District Court
Northern District of California

them from giving rise to the same kind of immediate, concrete, and specific obligations. Even if "[c]ourts traditionally take a pragmatic and flexible view of finality," on the question of "whether the result of [the agency's decisionmaking] process is one that will directly affect the parties," courts have "looked to . . . whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 780 (9th Cir. 2000). The Guidelines simply do not have "a direct and immediate effect" on physicians or laypersons. As Defendants correctly note, even with the "web" of regulations incorporating the Guidelines that Plaintiffs have identified, the "legal consequences, if any, cannot be divined from the Guidelines" themselves, Dkt. 28 at 14, due to the discretion of the third-party agencies, organizations, or states in interpreting and adhering to the Guidelines.[16] In short, the Guidelines, as challenged here, are not final agency action subject to review.

## V. CONCLUSION

Plaintiffs fail to show that they have standing and that the Guidelines, as alleged, constitute final agency action subject to judicial review under the APA. As previously noted, while standing is a defect that theoretically could be cured with an amendment, the failure to identify final agency action is not. Since leave to amend would therefore be futile, the motion to dismiss is granted with prejudice.

**IT IS SO ORDERED**.

---

individuals make tailored and affordable choices that meet their personal, cultural, and traditional preferences." Guidelines at viii.

[16] Plaintiffs are correct, however, that voluntariness—such as in adopting the Guidelines or participating in programs whereby funding is dependent on adherence to the Guidelines—is irrelevant to the analysis. The discretion described here, therefore, refers not to discretion regarding whether or not to adhere to the Guidelines, but about how specific entities apply the requirement of being "consistent with" the content described therein.

1

2   Dated: February 9, 2023

3   _____

4   RICHARD SEEBORG
    Chief United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California